Filed 12/29/21  In re S.L. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re S.L., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>J.L.,<br><br>    Defendant and Appellant.<br><br>Ju.L.,<br><br>    Respondent. | D078958<br><br><br>(Super. Ct. No. J520636A) |

APPEAL from an order of the Superior Court of San Diego County, Rohanee Zapanta, Judge.  Affirmed.

Elena S. Min, under appointment by the Court of Appeal, for Defendant and Appellant, J.L.

Paul A. Swiller, under appointment by the Court of Appeal, for Respondent, Ju.L.

1

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Tahra Broderson, Deputy County Counsel, for Plaintiff and Respondent.

J.L. (Mother) appeals the dispositional order issued in the Welfare and Institutions Code section 300[1] dependency proceedings for her now three-year-old daughter, S.L. Mother contends: (1) substantial evidence does not support the juvenile court's dispositional order placing S.L. in the care of her father, Ju.L. (Father); and (2) the court prejudicially erred by excluding from evidence certain exhibits that she offered at the contested jurisdictional and dispositional hearing. Based on our reasoning *post*, we disagree and affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2017, Mother and Father began a cohabitation relationship that resulted in S.L.'s birth in April 2018. In February 2019, their relationship ended and family court proceedings were subsequently conducted in Washington and California regarding their respective rights to custody of, and visitation with, S.L. Mother also obtained temporary restraining orders (TROs) against Father in both states, but those restraining orders were not made permanent.

In January 2020, Mother moved with S.L. to Seattle, Washington and lived with maternal relatives. In February, Father also moved to Seattle. [2] In April, Mother began a relationship with A.H. and became pregnant. A.H.

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2] Although Father stated they had reconciled, Mother disagreed and stated she merely arranged for Father's housing and employment in Washington because he complained about paying child support.

had a history of sexual abuse as a minor, both as victim and as a perpetrator. He also had a criminal history, including convictions for entering a noncommercial dwelling and tampering with a vehicle.

In April, Mother left S.L. with the maternal grandmother and returned to San Diego purportedly to retrieve her vehicle.[3] While Mother was in San Diego, Father picked up S.L. from the maternal grandmother, took her back to San Diego, and refused to return her to Mother. On Mother's return to Washington, she obtained a court order requiring Father to return S.L. to her and Father complied with that order. In September, Mother and A.H. had an argument and temporarily broke up and A.H. was subsequently placed on a section 5150 hold.

In October, Father visited S.L. three days in a row. Each time, A.H. brought S.L. to him and picked her up after Father's visit. On the third day, Father observed bruising on S.L.'s back and shoulder that appeared to be bite marks. Father photographed the bruises, but did not report them to authorities or seek medical treatment for S.L. and returned her to Mother pending family court proceedings. In mid-December, A.H. cared for S.L. while Mother gave birth to A.L.

On December 17, the California family court held a contested hearing regarding S.L. and issued a custody and visitation order requiring, inter alia, Mother to give S.L. to Father by 2:00 p.m. on December 24. The order provided that if Mother remained in San Diego, the parents would share physical custody of S.L. based on a "2/2/5" schedule. However, if Mother were to return to Washington, then Father apparently would have primary physical custody of S.L.

---

[3] Father instead asserted that Mother had moved back to San Diego.

At 2:00 p.m. on December 24, A.H., alone, brought S.L. to Father for his visitation. Father did not observe any bruising on S.L. on December 24 or 25. Father cared for S.L. until 8:00 a.m. on December 25. At 4:00 p.m. on December 25, Father picked up S.L. and cared for her until 8:00 a.m. on December 27.

At 8:00 a.m. on December 26, Father gave S.L. a bath for the first time in December. He observed, and then photographed, bruises on her bottom, including large bruises on the left and right side of her buttocks that were shaped like bite marks. On observing the bruises, the paternal great-grandmother thought they looked like bite marks. Other friends and relatives advised Father to call the child welfare services hotline to report the suspected child abuse and take S.L. to a doctor.

That evening, Father sent Mother an email message informing her that he had observed bruises on S.L.'s bottom and asking her if she knew a reason for them. Mother replied that she had not seen the bruises and suggested that S.L. may have sustained the bruises while in his care. Despite Father's further questions, Mother had no explanation, and denied any responsibility, for S.L.'s bruises. When he asked who else had watched S.L. in Mother's home, Mother did not reply.

Father called the child abuse hotline, reported the suspected child abuse of S.L., and was instructed to take her to a doctor. He then called and scheduled a doctor's appointment for S.L. on either December 28 or 29 and then asked Mother to take S.L. to the appointment. Father returned S.L. to Mother later on December 27.

On December 29, a San Diego County Health and Human Services Agency (Agency) social worker visited Mother's home and observed, and took photographs of, bruises on S.L.'s buttocks. Mother stated she had seen S.L.'s

4

bruising after her return on December 27, but did not report it to anyone. She had postponed S.L.'s doctor's appointment because she had not been given sufficient notice to obtain transportation. The social worker drove Mother and S.L. to the hospital where Dr. Natalie Laub, a child abuse medical expert, examined S.L. Mother told Dr. Laub that she was the only person who cared for S.L. and initially stated no one else lived with them, but later admitted A.H. lived in the home. Mother stated she had not seen any bruising on S.L. when she bathed S.L. on December 25 prior to going to Father's home.

Dr. Laub found that S.L. had "[t]wo adjacent semilunar brownish/yellow bruises on middle of left buttock. Within the larger bruises there are smaller more violaceous areas. This bruise is consistent with a human bite mark." In addition, Dr. Laub found "[t]wo adjacent bruises on a right buttock with a similar semilunar appearance, however the bruises themselves are more amorphous. This could also be consistent with a human bite mark." Dr. Laub opined that the bruises were indicative of physical abuse and, in particular, expressed concern that S.L. had been sexually abused. Dr. Laub could not determine specifically when S.L. suffered her injuries, but could only conclude that the injuries occurred when Father, Mother, and A.H. had access to S.L.

When San Diego Police Detective Thibault-Hamill interviewed Mother, Mother stated A.H. did not seem to be mentally stable. When shown photographs of S.L.'s injuries, Mother appeared to show no empathy. When another officer interviewed A.H., he implied that he had cared for S.L., as well as for his newborn son, A.L.

In January 2021, the Agency filed a section 300, subdivision (b)(1) petition, alleging that on or about December 26, 2020, S.L. had suffered, or

5

there was a substantial risk of her suffering, serious physical harm or illness as a result of the failure or inability of her parent to supervise or protect her adequately. In particular, the petition alleged S.L. suffered bruising on both sides of her buttocks, which bruising a child abuse expert determined to be consistent with a human bite mark and were indicative of physical abuse. It further alleged that neither parent could explain how S.L. had suffered those injuries and that she had been in the care of Mother, Father, and A.H. during the time the bruising was discovered.

At the detention hearing, the court found the Agency had made a prima facie showing in support of its petition, detained S.L. in out-of-the-home care, and granted Mother and Father supervised visits. The court also found that Father was S.L.'s presumed father.

In its initial jurisdiction and disposition report, the Agency stated that S.L.'s foster mother had reported an incident during which S.L. had touched the penis of her four-year-old foster sibling in the bathroom. The foster mother also reported that S.L. had tantrums and cried at night. When an Agency social worker attempted to speak with A.H., he declined to do so on advice of his counsel. Mother wanted her attorney to be present when meeting with the social worker, but such meeting had yet to occur. Father told the social worker that he should have taken S.L. for medical attention before returning her to Mother.

At the February initial jurisdiction and disposition hearing, pursuant to the parents' request, the court set a contested hearing on the petition's

6

allegations and S.L.'s placement. In March, the court ordered that S.L. be detained with her maternal aunt.[4]

In its addendum report, the Agency stated that both parents had enrolled in child abuse and parenting classes. After A.H. had threatened the relative caregiver for A.L. (S.L.'s sibling), that relative refused to supervise his visits with A.L. or allow him in her home. The Agency also reported that Father's visits with S.L. had gone well and he had called nightly to talk with her. He also had attended her dental appointment along with the maternal aunt.

At the contested jurisdiction and disposition hearing held over four days in April and May, the court admitted in evidence the Agency's reports and addenda and certain exhibits offered by Mother. The court also heard the testimony of Dr. Laub, Mother, Father, two Agency social workers, and Dr. Thomas Grogan, a pediatric orthopedic expert. Dr. Laub testified that S.L.'s bite marks were caused by a human, not an animal, and the perpetrator would have been at least a teenager, based on the size of the bites. Based on scientific literature, S.L.'s bruises could not be dated because there is no standard progression regarding a bruise's colors and in which order the colors appear. An adult bruise that contains the color yellow would be over 18 hours old, but children heal differently than adults. Dr. Laub disagreed with Dr. Grogan's position that S.L.'s bruises were four to six days old when a photograph was taken of them. Rather, Dr. Laub could not determine whether S.L.'s bruising had been inflicted hours before, the night before, or days before the photograph had been taken. Dr. Laub was

_____

[4]    In A.L.'s separate dependency proceeding, he was detained in the home of a paternal relative. The orders issued in A.L.'s dependency case are not the subject of the instant appeal.

concerned that S.L. had been sexually abused because her bite marks were located on a private area of her body. Although S.L.'s genital area did not show signs of sexual abuse, scientific literature reported that adults bite children and their private parts for sexual gratification. Although she could not determine the perpetrator's intent from S.L.'s injuries, Dr. Laub concluded that S.L.'s injuries showed child abuse, whether it was sexual abuse or merely physical abuse. Furthermore, the bites that resulted in the bruising would have been painful to S.L. when inflicted.

Mother testified that she was S.L.'s primary caregiver when she was with her, although A.H. would help her with little things. A.H. paid her rent and most of her other expenses. On December 25, she did not observe any bruising on S.L.'s buttocks when she bathed S.L. about 15 to 20 minutes before she went to Father's home. When S.L.'s bite marks were discovered, only A.H. lived with her in the home. Mother denied ever seeing A.H. doing anything inappropriate with S.L. She further denied ever leaving S.L. or A.L. alone with A.H., even when she showered. She had postponed S.L.'s doctor's appointment because she did not have transportation and did not consider her injuries to be urgent. Mother testified that she was concerned S.L. had been injured at Father's home because he was abusive, had substance abuse issues, and lived with others that had substance abuse issues. Mother stated that Father had been violent toward her seven to 10 times and S.L. was present each time. She testified that Father had punched her, pulled her hair, and pushed her while in S.L.'s presence or when she was holding her. The most recent incident of Father's aggression in S.L.'s presence was in February 2020, during which incident he yelled at Mother while driving under the influence. She did not believe Father had ever received substance abuse treatment.

8

Although Mother testified that she was currently living with a friend, she did not identify that friend or give any details about where she was residing. She stated that A.H. did not come to her home. Mother was unaware that A.H. had been the victim and perpetrator of sexual abuse. When she asked him whether he had hurt S.L., A.H. denied it. She testified that she currently was not sure whether she believed his denial. His outbursts with his relatives made her think he may have caused the bruising, although she had never seen him angry before that. She did not know whether it was safe to leave S.L. and A.L. in his care.

Father testified that after his three visits with S.L. in mid-October 2020, he did not see her again until December 24. He did not perform a body check of S.L. each time he received her from Mother and A.H. When on December 26 he bathed S.L. for the first time, he observed the bruises and tried to ask her what happened, but she just smiled. He testified that he was S.L.'s caregiver the entire time that he had her over the Christmas holidays. After consulting with relatives and friends about his suspicions that S.L. had been abused and after Mother did not respond to his questions about the bruising, he called the child abuse hotline on the morning of December 28. The social worker with whom he had spoken advised him to seek medical attention for S.L. as soon as possible. Father testified that he should not have returned S.L. to Mother, but did not want to violate the family court order. He denied driving under the influence of alcohol with Mother and S.L. in the car; rather, Mother had been driving. He was not concerned that Mother would hurt S.L. prior to the December court hearing or when they both cared for her together.

An Agency social worker testified that A.H. had threatened the relative caregiver of A.L., stating: "I hope you die." A.H. had recently enrolled in a

9

child abuse group class and was participating in a parenting class. A.H. did not discuss with the social worker his section 5150 incident. Mother was calm and patient during her visits with S.L. and A.L. The social worker had spoken with Father and observed many of his visits with S.L. and had not noticed that he had any anger issues.

Dr. Grogan, a pediatric orthopedic expert, testified that his observation of Father's photograph of S.L. showed a bite mark pattern in her bruising. He was fairly certain the bruising was caused by an adult. Based on findings from his 1984 study on adult rabbits, he opined that the bruising shown on the photograph of S.L. would appear within one hour and would not take 14 to 16 hours to appear and that the bruising would have been inflicted within four to six days before. However, he had not performed any research on the dating of bruising to children in S.L.'s age range. S.L.'s bruising did not require an emergency hospital visit and would have resolved without medical treatment.

Considering the evidence and arguments of counsel, the court found the petition's allegations true by a preponderance of the evidence. The court then heard arguments of counsel on S.L.'s disposition and found there was not clear and convincing evidence to support her removal from Father's custody, stating: "Father . . . remained concerned, remained proactive, remained offering to do anything that he could to be able to ensure that he could support [S.L.] in maintaining her health and safety." However, regarding Mother, the court was concerned she could not properly assess the risk of harm to S.L., noting Dr. Laub testified that S.L.'s injuries would have been painful to her and Mother had postponed medical treatment for her and failed to look into her injuries. By clear and convincing evidence, the court

10

found that removal of S.L. from Mother's custody was necessary to protect her.

Mother timely filed a notice of appeal challenging the court's dispositional order.

## DISCUSSION

### I

*Jurisdictional and Dispositional Findings Generally*

#### A

*Jurisdiction.* " 'A dependency proceeding under section 300 is essentially a bifurcated proceeding.' [Citation.] First, the court must determine whether the minor is within any of the descriptions set out in section 300 and therefore subject to its jurisdiction." (*In re Stephen W.* (1990) 221 Cal.App.3d 629, 645.) In particular, section 300, subdivision (b)(1) provides that a child is within the jurisdiction of the juvenile court and may be adjudged a dependent child of the court if the child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness as a result of the failure or inability of the parent or guardian to adequately supervise or protect the child or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left. A section 300 petitioner has the burden to prove by a preponderance of the evidence that the petition's allegations are true and the child is therefore subject to the court's jurisdiction. (§ 355, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248 (*Cynthia D.*); *In re Brison C.* (2000) 81 Cal.App.4th 1373, 1379.)

B

*Disposition.* After a juvenile court exercises jurisdiction over a child pursuant to section 300, it must determine the appropriate disposition for that child. (§§ 360, subd. (d), 361, 362; *In re N.M.* (2011) 197 Cal.App.4th 159, 169 (*In re N.M.*).) The court has broad discretion in choosing an appropriate disposition that serves the child's best interest. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179.) Before physically removing a child from his or her parent, the court must find, by clear and convincing evidence, that the child would be at substantial risk of harm if returned home and that there are no reasonable means to protect the child without such removal.[5] (§ 361, subd. (c)(1); *In re Cole C.* (2009) 174 Cal.App.4th 900, 917 (*Cole C.*); *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654 (*Kristin H.*).) The court must also determine whether reasonable efforts were made to prevent or eliminate the need for removal of the child from his or her home and state the facts on which its decision to remove the child is based. (§ 361, subd. (e); see *In re D.P.* (2020) 44 Cal.App.5th 1058, 1067.) To assist the juvenile court, the Agency must describe "the reasonable efforts [it] made to prevent or eliminate removal." (Cal. Rules of Court, rule 5.690(a)(1)(B)(i).)

"A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of potential detriment to the child if he or she remains with the parent." (*In re N.M.*, *supra*, 197 Cal.App.4th at

---

[5]     As relevant here, the juvenile court may remove a child from his or her parent if the court finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody. . . ." (§ 361, subd. (c)(1).)

p. 169.)  In determining whether removal from a parent's home is necessary, the court may consider the parent's past conduct as well as current circumstances.  (*Cole C.*, *supra*, 174 Cal.App.4th at p. 917; *In re John M.* (2012) 212 Cal.App.4th 1117, 1126 (*John M.*).)  An order removing a dependent child from his or her home does not require proof that the parent is dangerous or has actually harmed the child.  (*Cole C.*, at p. 917.)  The purpose of removing a child from his or her parent's home is to protect the child from future possible harm.  (*Ibid.*)

C

*Substantial evidence standard of review*.  On appeal, we review the juvenile court's jurisdictional and dispositional findings and orders for substantial evidence to support them.  (*Cynthia D.*, *supra*, 5 Cal.4th at p. 249; *In re Isabella F.* (2014) 226 Cal.App.4th 128, 137; *In re N.M.*, *supra*, 197 Cal.App.4th at pp. 168, 170; *Cole C.*, *supra*, 174 Cal.App.4th at pp. 916-918.)  The burden of proof for jurisdictional findings is preponderance of the evidence, whereas for dispositional findings the burden of proof is by clear and convincing evidence.  (*Cynthia D.*, at p. 248.)  Accordingly, in applying the substantial evidence standard in reviewing the juvenile court's dispositional findings and order, we must bear in mind the heightened requirement of proof by clear and convincing evidence.  (*In re V.L.* (2020) 54 Cal.App.5th 147, 154-155 (*In re V.L.*); *Kristin H.*, *supra*, 46 Cal.App.4th at p. 1654.)  Because section 361, subdivision (c) requires proof by clear and convincing evidence, we must determine "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true."  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996; see also *In re V.L.*, at pp. 154-155 [standard of review described in *Conservatorship of O.B.* applies to removal findings under

13

§ 361, subd. (c)].) Likewise, the substantial evidence standard of review applies to a finding under section 361, subdivision (e) that reasonable efforts were made to prevent or eliminate the need to remove a child from his or her parent. (*In re A.G.* (2017) 12 Cal.App.5th 994, 1001.) Substantial evidence is evidence that is reasonable, credible, and of solid value. (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564.) In applying this standard, we " 'must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence.' " (*Conservatorship of O.B.*, at p. 996; see *In re V.L.*, at p. 154.) We do not consider the credibility of the witnesses or reweigh the evidence. (*In re Lana S.* (2012) 207 Cal.App.4th 94, 103 (*Lana S.*); *Conservatorship of O.B.*, at p. 1008.) We must affirm an order that is supported by substantial evidence even if other evidence, or other inferences from the evidence, would have supported a contrary finding. (*In re Manuel G.* (1997) 16 Cal.4th 805, 823; *R.M. v. T.A.* (2015) 233 Cal.App.4th 760, 780 (*R.M.*); *In re N.M.*, *supra*, 19 Cal.App.4th at p. 68.) On appeal, the parent challenging the juvenile court's order has the burden to show there is insufficient evidence to support the court's decision. (*Lana S.*, at p. 103; *In re N.M.*, at p. 168.)

## II

### *Substantial Evidence Supports Court's Dispositional Order*

Mother contends that substantial evidence does not support the court's dispositional order placing S.L. in Father's care because there was insufficient evidence to support its finding that S.L. would not be at substantial risk of harm if returned to Father. We disagree.

Based on our review of the record, there is substantial evidence to support the court's finding that S.L. would not be at substantial risk of harm if she were returned to Father. In particular, in finding that clear and convincing evidence did not show S.L. should be removed from Father, the court stated that Father had "remained concerned, remained proactive, remained offering to do anything that he could do to be able to ensure that he could support [S.L.] in maintaining her health and safety." Contrary to Mother's assertion, the court could reasonably infer from the evidence that Father was not, in fact, the perpetrator of the physical abuse of S.L. Father testified at the contested hearing that he discovered S.L.'s bruising while bathing her for the first time in December. He had not previously suspected any abuse. He stated that he wished he had not returned S.L. to Mother after discovering the bruising, but did so to comply with the family court order. He also testified how he discussed S.L.'s bruising with family members and friends, then informed Mother about it, and ultimately reported the suspected abuse of S.L. to the Agency. He also then called and made a doctor's appointment for S.L., which appointment Mother postponed until the following day. In addition, the court could reasonably find that Father's present circumstances showed that he was a loving, concerned parent who had cooperated with the Agency, enrolled in voluntary services, and had positive and consistent visits with S.L. Based on Father's testimony and the Agency's reports, the court could reasonably find that Father was credible and not the perpetrator of the physical abuse of S.L., but was instead a concerned, proactive parent who was attempting to protect his daughter.

Furthermore, the court could have reasonably found that Father's history of domestic violence, his criminal record, and/or his substance abuse problems did not prove either that he was the perpetrator of S.L.'s physical

15

abuse or that S.L. would otherwise be at substantial risk of harm if returned to him. In particular, the court could reasonably place more weight on Father's present circumstances in attempting to protect S.L. than on his past incidents of domestic violence or problems with substance abuse.

In arguing that there is insufficient evidence to support the court's finding that S.L. would not be at substantial risk of harm if returned to Father, Mother cites only evidence and inferences therefrom that would have supported a contrary finding by the court and, in effect, suggests that we reweigh the evidence admitted at the contested hearing.[6] By so arguing, Mother misconstrues and/or misapplies the substantial evidence standard of review. As discussed *ante*, in applying the substantial evidence standard of review, we view the evidence in the light most favorable to the court's finding, make all reasonable inferences from the evidence, and resolve all conflicts in support of the finding. (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 996; *In re V.L.*, *supra*, 54 Cal.App.5th at p. 154.) We do not consider the credibility of the witnesses or reweigh the evidence. (*Lana S.*, *supra*, 207 Cal.App.4th at p. 103; *Conservatorship of O.B.*, at p. 1008.) Accordingly, we must affirm an order that is supported by substantial evidence even if other evidence, or other inferences from the evidence, would have supported a contrary finding. (*R.M.*, *supra*, 233 Cal.App.4th at p. 780; *In re N.M.*, *supra*, 197 Cal.App.4th at p. 168.) By citing only evidence and inferences therefrom that would have supported a contrary finding by the juvenile court, Mother has not carried her burden on appeal to show that substantial evidence does

---

6    Mother argues in her reply brief that she does not suggest that we reweigh the evidence. However, based on our reading of her opening brief, her citation solely to evidence and inferences therefrom that would have supported a contrary finding by the court suggests to us that she implicitly asks us to reweigh the evidence.

not support the court's dispositional finding that clear and convincing evidence did not show S.L. would be at substantial risk if returned to Father.[7]

## III

*No Abuse of Discretion by Excluding Mother's Evidence*

Mother contends the juvenile court prejudicially erred by excluding certain exhibits that she offered in evidence at the contested jurisdictional and dispositional hearing.

## A

*Legal principles.* The admissibility of evidence is to be decided by the trial court. (Evid. Code, § 310.) "No evidence is admissible except relevant evidence." (Evid. Code, § 350.) "Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.) "Relevant evidence" means evidence that has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

"In ruling on the admissibility of evidence, the trial court is vested with broad discretion." (*Cole C.*, *supra*, 174 Cal.App.4th at p. 911.) The court's evidentiary ruling will be reversed only if it clearly has abused its discretion. (*Ibid.*) The appropriate test for abuse of discretion is whether the court has exceeded the bounds of reason. (*Ibid.*) A reviewing court will not disturb a discretionary decision of the trial court unless it has exceeded the limits of

---

7    Because we conclude that there is substantial evidence to support the court's finding that S.L. would not be at substantial risk if returned to Father, we need not address, and Mother has not substantively argued, whether there is substantial evidence to support an additional or alternative finding by the court that there were reasonable means to protect S.L. without removal from Father. (§ 361, subd. (c)(1).)

legal discretion by making an arbitrary, capricious, or patently absurd determination. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318 (*Stephanie M.*).) It is the appellant's burden on appeal to affirmatively establish the court abused its discretion. (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.) Furthermore, even if the court has abused its discretion by improperly excluding evidence, that error is not prejudicial, or reversible, error unless it is reasonably probable a result more favorable to the appellant would have been reached absent the error. (*Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1432 (*Tudor Ranches, Inc.*); *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

B

*Mother's argument.* Mother asserts the court prejudicially abused its discretion by excluding her Exhibits 2, 3, 6, 7, 8, 9, 10, and 11. In particular, she argues the court erred by excluding: (1) Exhibits 2 and 3, which were transcripts of September 2018 video recordings purportedly showing that Father hit Mother in the face; (2) Exhibit 6, which was a text message from a police detective to Mother informing her of a domestic violence case number; (3) Exhibits 7 and 8, which were photographs purportedly showing injuries to Mother and her minor son; (4) Exhibit 9, which was a February 2019 TRO issued against Father and a notice of hearing on Mother's request for a permanent restraining order; (5) Exhibit 10, which purportedly was a March 2019 family court services memo discussing Mother's allegations that Father had a history of violence and substance abuse; and (6) Exhibit 11, which was Mother's April 2020 request for a TRO against Father. Mother argues the court abused its discretion by only considering the circumstances underlying the petition's allegations in ruling that the excluded exhibits were too remote

18

in time and irrelevant to the contested issues at the jurisdictional and dispositional hearing.

C

*No abuse of discretion in excluding exhibits.* In ruling on the admissibility of Exhibits 2 and 3, the court stated: "[T]he court is looking at the circumstances that led to the allegations in the petition in this case; . . . . And for those reasons, [the] court finds [Exhibits] 2 and 3 too remote in time and not relevant; however, [the court] will take testimony from [Mother] with regard to any type of impeachment given any statements or evidence alleging [Father] and his position on violence. And then, of course, [Mother's] availability to testify and impeach with regard to her personal experience as it relates to allegations in this case. And that's both for [jurisdiction] and [disposition]." In ruling on the admissibility of Exhibits 6, 7, and 8, the court stated it "will note again, those [exhibits] do relate to an incident involving alleged violence. [¶] Again, . . . [the] court will rule and exclude those as too remote in time and also not relevant. . . ." In ruling on the admissibility of Exhibits 9, 10, and 11, the court stated: "[A]gain, they are related to alleged incidents of violence, but again, that would be specific only to the family law case and other previous incidents prior to the circumstances surrounding the allegations of this case, notably, the visitation that was scheduled and being followed on or about the time the petition was filed." Accordingly, the court excluded those eight exhibits as irrelevant to the contested issues, subject to their admissibility as impeachment evidence if Father were to present evidence of his nonviolence. Later during the trial, the court again rejected Mother's proffer of Exhibits 2 and 3, finding them irrelevant and stating that it had already heard the testimony of Mother and Father regarding the

19

purported domestic violence and that purported domestic violence did not involve inflicted abuse of S.L. as in this case.

In ruling on the relevance of the eight exhibits, we presume the juvenile court was aware that in determining the dispositional issue of whether removal from Father's home was necessary, it could consider Father's past conduct as well as current circumstances. (*Cole C.*, *supra*, 174 Cal.App.4th at p. 917; *John M.*, *supra*, 212 Cal.App.4th at p. 1126.) Contrary to Mother's assertion, the record does not affirmatively show that the court applied an improper legal standard in exercising its discretion to exclude her exhibits as irrelevant. (Cf. *In re Y.M.* (2012) 207 Cal.App.4th 892, 918.) Here, despite the arguable relevance of Father's past conduct in general, the court could nevertheless reasonably conclude the eight exhibits were irrelevant to, among other things, the dispositional issue of whether S.L.'s removal from Father was necessary to protect her from a substantial risk of harm. First, as the court noted, all of the exhibits were remote in time, relating to incidents or documents prior to the alleged physical abuse of S.L. in December 2020 and the Agency's subsequent filing of the petition. Furthermore, the court could reasonably conclude the excluded exhibits were not relevant because they did not tend to prove a main issue in the dispositional hearing, as opposed to merely an irrelevant collateral issue or matter. (See, e.g., *Winfred D. v. Michelin North America, Inc.* (2008) 165 Cal.App.4th 1011, 1032.) Here, the court could reasonably have concluded that because Mother and Father had ended their relationship, any evidence of their past domestic violence in S.L.'s presence was irrelevant regarding her placement with Father due to the unlikelihood of such future domestic violence. Lacking probative value on a contested dispositional issue, the eight exhibits were reasonably excluded by the court. Even if another court

may have ruled otherwise and found the exhibits relevant and admissible, that does not prove the court here exceeded the bounds of reason and abused its discretion by making an arbitrary, capricious, or patently absurd determination by excluding those exhibits are irrelevant. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 318; *Cole C., supra*, 174 Cal.App.4th at p. 911.)

D

*No prejudicial error*. In any event, assuming arguendo the court abused its discretion by excluding some or all of the eight exhibits, we nevertheless conclude Mother has not carried her burden on appeal to show that the assumed error was prejudicial (i.e., that it is reasonably probable Mother would have obtained a more favorable result had the court admitted those exhibits). (*Tudor Ranches, Inc., supra*, 65 Cal.App.4th at p. 1432; *Watson, supra*, 46 Cal.2d at p. 836.) In a conclusory manner, Mother simply argues in her opening brief: "[T]he exclusion of those exhibits was prejudicial to [her] because it resulted [*sic*] led to [S.L.'s] placement with [Father]. [Citation.] Based on that placement, [Father] could seek to terminate jurisdiction over [S.L.] with exit orders awarding him full physical and legal custody of [her], which would prejudice Mother's right to care for and make decisions regarding her child. [Citation.]" By so arguing, Mother misconstrues and/or misapplies the standard for prejudicial error.[8] She does not argue, much less show, that it is reasonably probable the juvenile court would *not* have placed S.L. with Father *if* it had *admitted* the eight exhibits that she argues were erroneously excluded. Furthermore, based on our review of record, we conclude that because the court heard testimony of

_____

8      In her reply brief, Mother restated her opening brief argument regarding prejudice and, in so doing, continued to misconstrue and/or misapply the correct standard for prejudicial error.

Mother, and admitted other evidence, showing that Father had a history of domestic violence and substance abuse, the excluded evidence apparently would have been largely duplicative and/or cumulative of other evidence admitted at the contested hearing. Therefore, even if the court had admitted the eight exhibits, it does not appear reasonably probable that the court would have found S.L. would be at substantial risk if returned to Father and therefore ordered that she be removed from his care. (*Tudor Ranches, Inc.*, at p. 1432; *Watson*, at p. 836.) Accordingly, we reject Mother's contention that the court *prejudicially* erred by excluding Exhibits 2, 3, 6, 7, 8, 9, 10, and 11.

DISPOSITION

The order is affirmed.


HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


HALLER, J.